THE VILLAGE OF LAKE BLUFF, Plaintiff-Appellant and Cross-Appellee, *v.* MICHAEL JACOBSON *et al.,* Defendants-Appellees and Cross-Appellants.

Second District   No. 83—265

Opinion filed September 19, 1983.—Rehearing denied October 25, 1983.

Peter J. Nordigian, of Lonchar, Nordigian & Radosevich, of Waukegan, and Jeffrey R. Ladd and Angelika Kuehn, both of Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago, for appellant.

Thomas R. Burney, of Schain, Burney & Kenny, of Chicago, and Wasneski, Kuseski & Flanigan, of Waukegan, for appellees.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The village of Lake Bluff (Village), a municipal corporation, pursuant to its subdivision regulation ordinance, filed an amended complaint seeking to enjoin construction of a 72-unit apartment building on property outside of but within 1½ miles of its corporate limits. The trial court denied the motion of the Village for a preliminary injunction, finding that there was no just reason for delaying enforcement or appeal of the order. The Village appeals from this order and from a prior order denying a temporary restraining order.

The defendants, the First National Bank of Lake Forest, as holder of legal title to the subject property, Marling Management

Company, a proprietorship engaged in the development of the property and Michael Jacobson, an employee of Marling Management (Developer), cross-appeal from certain findings by the trial court contained in its interlocutory order.

The property is located in unincorporated Lake County, in an area referred to in the record as "Knollwood," within 1½, miles of the Village's corporate limits. On December 14, 1982, Marling Management obtained a building permit from Lake County for construction, on the previously undeveloped site, of a three-story 72-unit apartment building with 144 parking spaces. Marling Management also obtained approval for the development from the North Shore Sanitary District, the Lake County public works department, the Knollwood fire department and the Illinois Environmental Protection Agency.

Robert W. Marling, the company's owner, testified at the hearing on the preliminary injunction that the company had no intention of subdividing the property and intended to keep the property under its unified development and control and to manage and own the property after construction was completed. The company has not and does not intend to prepare or record any plat in connection with the construction.

As of the hearing date Marling Management had begun grading the property, laying sewer and water pipe in the sewer and water mains, constructing roads and constructing storm drains on the property.

On April 11, 1978, the Village adopted a subdivision ordinance which provided, in part:

> "The provisions contained herein shall be applicable to all subdivisions in the Village of Lake Bluff and as to all subdivisions within any unincorporated area lying within one and one-half miles of the corporate limits of the Village of Lake Bluff, this ordinance shall be applicable to all regulations contained herein to the extent permitted by law and the Statutes of the State of Illinois in effect from time to time."

On March 11, 1980, the Village adopted an amendment to the ordinance which read:

> "The provisions of this Ordinance shall also apply to all Planned Developments whether Residential, Commercial, or otherwise in nature, and to any other developments whether a Subdivision is required or not under the law, statutes, ordinances or regulations of the governmental body or agency having jurisdiction or control, and regardless of whether the same is labeled a subdivision or not, it being the intent of this ordi-

nance to apply to all types of development, both within the Village of Lake Bluff and to areas lying within one and one-half miles of the corporate limits of the Village of Lake Bluff."

Marling Management did not seek Village approval of the public improvements at the subject property. On January 24, 1983, Robert Marling conversed by telephone with Phyllis Albrecht, the Village president. Marling testified that he told her that the Village was welcome to review Marling Management's plans but that Albrecht declined, and that Marling Management never received any communication from the Village telling it to submit its plans to the Village or stop work on the property. According to Albrecht, she told Marling that the Village felt that it had jurisdiction over the development and that the Village was trying to procure plans from the county. She did not send or authorize sending any notice to defendants advising them not to proceed with construction.

At the hearing on the motion for a preliminary injunction, Kenneth E. Long, the Village administrator since September 1981, testified that he had had a brief opportunity to look at the plans for development of the subject property. He noted that some private streets were proposed, although the Village's subdivision ordinance required streets to be dedicated. He was generally familiar with drainage patterns on the property and stated that generally water would flow toward the East Skokie drainage ditch located within the Village. The property was also within the Lake Bluff park district and school district and the Lake Bluff-Lake Forest high school district, all of which, by the Village subdivision ordinance, would have to receive land or cash as a condition for approval. Long did not know whether enrollment was increasing or decreasing in the school district, but admitted that there were plans to close one of the schools in the high school district. He could not say how many children the proposed development would add to the school district.

According to Long, the Village subdivision ordinance makes no provision for storm water detention. The Village building inspection is done by contract with Lake Forest, although the Village engineer inspects public improvements. Long stated that the Village did not provide sewer or water service to the property, although it did provide supplementary fire protection and very limited emergency police protection to the area. The Village does not presently maintain or service any of the streets in or about the subject property and does not provide any garbage collection or snow-plowing services to the area.

The Village filed its complaint for injunction on February 24, 1983. Its motion for a temporary restraining order with notice was

denied on February 28, 1983. The Village filed an amended complaint for injunction on March 2, 1983, and a motion for a preliminary injunction. After a hearing, the motion was denied. The appeal and cross-appeal followed.

## I

■ The question whether there was error in denying the motion for preliminary injunctive relief poses the underlying issue whether the Village may enforce its subdivision ordinance against defendants' development.

The ordinance was passed pursuant to section 11—12—5(1) of the Illinois Municipal Code of 1961, which provides:

"Every plan commission and planning department authorized by this division 12 has the following powers and whenever in this division 12 the term plan commission is used such term shall be deemed to include the term planning department:

(1) To prepare and recommend to the corporate authorities a comprehensive plan for the present and future development or redevelopment of the municipality. Such plan may be adopted in whole or in separate geographical or functional parts, each of which, when adopted, shall be the official comprehensive plan, or part thereof, of that municipality. This plan may include reasonable requirements with reference to streets, alleys, public grounds, and other improvements hereinafter specified. *The plan, as recommended by the plan commission and as thereafter adopted in any municipality in this state, may be made applicable, by the terms thereof, to land situated within the corporate limits and contiguous territory not more than one and one-half miles beyond the corporate limits and not included in any municipality. Such plan may be implemented by ordinances (a) establishing reasonable standards of design for subdivisions and for resubdivisions of unimproved land and of areas subject to redevelopment in respect to public improvements as herein defined*; (b) establishing reasonable requirements governing the location, width, course, and surfacing of public streets and highways, alleys, ways for public service facilities, curbs, gutters, sidewalks, street lights, parks, playgrounds, school grounds, size of lots to be used for residential purposes, storm water drainage, water supply and distribution, sanitary sewers, and sewage collection and treatment; and (c) may designate land suitable for annexation to the municipality and the recommended zoning classification for such land upon annexa-

tion." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 24, par. 11—12—5(1).

The trial court in its order interpreted the enabling statute as requiring that, because the property was not and would not be divided into separate parcels, the Village must prove a *prima facie* case showing that the proposed development would have a substantial "developmental impact on existing facilities protecting the health and safety of the municipal residents," as a prerequisite to enforcement of the Village's subdivision ordinance; and concluded that a *prima facie* case had not been proved. The record shows that the trial court in adopting this interpretation relied upon *City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63. The court's reliance on *Urbana* requires our analysis of that holding.

In *Urbana*, the city sought to apply its subdivision requirements to a planned unit development (PUD) to be constructed within 1½ miles of the city. The trial court dismissed the city's complaint for declaratory and injunctive relief and the appellate court reversed. The supreme court held that the ordinance as written did not apply to the PUD because it contained a definition of "subdivision" which could not include the undivided 50 acre tract involved, but rejected the view that the city could not apply subdivision regulations to the PUD pursuant to section 11—12—5(1) (Ill. Rev. Stat. 1981, ch. 24, par. 11—12—5(1)) merely because the proposed development was unitary, with no actual subdivision of the property into parcels contemplated.

The court noted that in pure zoning matters the county's zoning ordinance would preempt the city's comprehensive plan and zoning regulations, and that in pure subdivision regulation matters the city's subdivision regulations would preempt any county ordinances within the 1½-mile zone. The court stated that "[t]he demarcation of authority [here] is not so clear, however, because a PUD involves both zoning and subdivision regulations ***." *City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63, 69.

Citing *Petterson v. City of Naperville* (1956), 9 Ill. 2d 233, for the proposition that the statute's purpose was to enable municipalities to deal with problems of public health and safety created by the development of territory contiguous to municipalities, the court reasoned that

> "[t]he statute clearly recognizes that a municipality has a legitimate interest in regulating the development of land near its borders to protect the health and safety of its people. There can be no doubt, of course, that the presence of a sizeable PUD on a city's borders will have substantial impact on the city. This impact is not necessarily eliminated or even diminished simply

because the PUD is not divided into separate parcels. In our judgment the *touchstone of a city's power to impose subdivision controls is not the division of a tract into two or more parcels but its developmental impact upon existing facilities protecting the health and safety of the municipal residents.* We conclude therefore that the present development is a subdivision within the statutory meaning." (Emphasis added.) *City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63, 70-71.

The trial judge read the underlined language to hold that a proposed development not divided into parcels is not a "subdivision" within the meaning of the statute unless it has a "developmental impact" on existing facilities, and that a municipality may not impose subdivision regulations on extraterritorial, nonsubdivided parcels unless it first meets its burden to show that "developmental impact." We disagree.

The statute does not define "subdivision," as the supreme court noted, and *Urbana* rejects the mechanical view that property cannot by a "subdivision" under the statute if it is unitary, rather than divided into parcels. In explaining that a city could regulate a unitary PUD, the supreme court appears to have reasoned that the city's police power interest in imposing subdivision regulations for protection of the health, safety and welfare of its people supported extraterritorial application of the regulations to property within a 1½-mile zone even where the property would not meet a technical definition of "subdivision."

■■ ■ We see nothing in the statute or in *Urbana* as intending to impose a preliminary evidentiary burden on a municipality to show "developmental impact" before proceeding to enforce subdivision regulations over contiguous territory. Nothing in *Urbana* assigns a burden of proof or lays down any evidentiary requirements. The language which the parties dispute (*City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63, 70-71) appears to be a reference to basic principles of police power regulation, *e.g.,* "a municipality has a legitimate interest in regulating the development of land near its borders to protect the health and safety of its people." The court's statement that "the touchstone of a city's power to impose subdivision controls is *** its developmental impact upon existing facilities protecting the health and safety of the municipal residents" seems no more than a restatement of the familiar principle that the police power is derived from a governing body's interest in protecting the well-being of its people, that regulation of extraterritorial property is within a municipality's police power as long as that regulation is rationally related to legiti-

mate municipal interests. The court's language can most plausibly be seen as an application of the broad principle that the "touchstone" of all police power is protection of people's health, safety and welfare.

This conclusion is bolstered by the fact that the court stated that "developmental impact" is the touchstone of a city's power to impose subdivision controls *in general*, not merely to unitary developments. While the court noted that subdivision controls could be imposed, without consideration of "developmental impact," on property divided into two or more parcels, we do not believe *Urbana* intended to set up a dual system where municipalities would be presumed to have control over extraterritorial property divided into two or more parcels and presumed not to have control over undivided extraterritorial property. The whole tenor of the opinion, and its holding that a PUD could be subjected to subdivision controls because of its undeniable, but unevidenced, impact on the city, points the other way.

The most reasonable reading of the statute, and the one most consistent with *Urbana*, seems to be that the statute gives municipalities the right to exercise their police power over extraterritorial developments in the same way that they exercise that power over developments within their territory, in recognition that a municipality's concerns do not end at its borders. (See *Petterson v. City of Naperville* (1956), 9 Ill. 2d 233.) The lack of developmental impact would, however, support an argument in a hearing on the merits that the subdivision ordinance was unconstitutional as applied, as the lack of impact on the city would indicate that its legitimate interests were not being advanced by application of its regulations in a particular case.

Defendant's property is apparently the type to which subdivision regulations could easily apply. The property has, or will have, streets, drainage facilities and other features which could be the subject of subdivision regulations. There is no argument that the Village is trying to apply zoning regulations or that the proposed development does not involve both zoning and subdivision regulations.

The Village has appealed from both the February 28, 1983, order of the motion judge denying a temporary restraining order (TRO), and from the March 9, 1983, order denying a preliminary injunction. The TRO was denied on the original complaint without a hearing, on the basis that the Village did not show irreparable injury. This was error. A municipality need not show irreparable injury to obtain either a temporary or preliminary injunction against the violation of its ordinances. (*City of Highland Park v. County of Cook* (1975), 37 Ill. App. 3d 15, 20.) The later proceedings were on an amended com-

plaint which was complete in itself and in effect abandoned the prior complaint. (*Bowman v. County of Lake* (1963), 29 Ill. 2d 268, 272.) The proceedings resulting in the March 9, 1983, order supplanted the earlier proceedings, making that portion of the appeal from the February 28, 1983, order moot.

■■■ We conclude that the trial court erred in denying a preliminary injunction as a matter of law.

## II

We also conclude that the cross-appeal by the Developer from the March 9, 1983, order is without merit. The cross-appeal is on the theory that whether or not there is a "developmental impact," the Village does not have subdivision jurisdiction over the Developer of the land outside of its borders and within 1½ miles because the development does not involve the division of the subject property into two or more parcels. This theory is contrary to the holding of the Illinois Supreme Court in *City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63, which allows a municipality to apply subdivision regulations to a unitary development such as a PUD. In *Urbana* there was an affidavit by the developer which was uncontested and which stated that the property had not been divided into lots and that no plat of subdivision had been or was to be prepared. (*City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63, 67.) The argument in behalf of the cross-appeal that *Urbana* allowed an application of subdivision regulations to the PUD only because of the possibility that the PUD could later be divided into individual lots is, in our view, a serious misreading of that opinion.

The judgment of the circuit court of Lake County is reversed and the cause is remanded for further proceedings consistent with this opinion. The relief requested in the cross-appeal is denied.

Reversed and remanded in part.

NASH and VAN DEUSEN, JJ., concur.